RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0317p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

RICHARD PAUL HODGSON, JR.,
                    *Petitioner-Appellee,*

        *v.*                                                    No. 09-1488

MILLICENT WARREN,
                    *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11311—Nancy G. Edmunds, District Judge.

Argued: April 28, 2010

Decided and Filed: September 29, 2010

Before: GIBBONS, ROGERS, and KETHLEDGE, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Phillip D. Comorski, Detroit, Michigan, for Appellee. **ON BRIEF:** Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Phillip D. Comorski, Detroit, Michigan, for Appellee.

—————————————

**OPINION**

—————————————

KETHLEDGE, Circuit Judge. The jury that convicted Richard Hodgson of attempted murder never heard the testimony of an eyewitness, Virginia Smith, who would have stated that, as she stood a few feet away from Hodgson during the shooting for which he was charged, she could see his hands and could confirm that he did not draw a gun. The State has conceded in this court, moreover, that Hodgson's trial counsel knew that Smith would testify to that effect if called. We therefore agree with the

1

district court that Hodgson received ineffective assistance of counsel, and that the state court's contrary conclusion "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court." 28 U.S.C.§ 2254(d)(1).

I.

A.

Late at night on April 12, 1998, Alicia Hernandez and Scott Anderson were shot as they stood outside a home in southwest Detroit. Hernandez was hit once in the leg, and Anderson was hit three times, with one bullet grazing his temple.

Within a month, the State of Michigan charged Hodgson with the attempted murders and one count of using a firearm in the commission of a felony. At Hodgson's trial, in November 1998, both Hernandez and Anderson implicated him as the shooter. Hernandez, who was 15 years old at the time of the shooting, testified that she had been standing outside with several other people when Hodgson and several of his friends walked down the street. Hodgson asked her where he could find her brother, Lorenzo Hernandez, with whom he had fought previously. When she refused to tell him, the two began to argue. At that point, she heard someone yell, "shoot the bitch," and saw Hodgson pull a gun from his waistband. She turned to run, but after a few steps she was shot in the leg and fell to the ground. All told, she heard roughly ten shots. Hernandez testified that, although she did not actually see Hodgson fire the shots because her back was turned, the shots had come from the direction where Hodgson was standing.

Anderson's account was similar. He testified that Hodgson arrived with three or four other men and began arguing with Hernandez. Hodgson said, "shoot the bitch," and then pulled a pistol from his waistband. Anderson turned and ran, but was quickly hit with three bullets. He estimated that he heard 10 or 11 shots in all. Like Hernandez, Anderson testified that he did not actually see Hodgson fire the shots. He added that he could not say whether the bullets had come from the direction where Hodgson was standing, because his back was turned when the shots were fired.

Thomas Anderson, Scott Anderson's brother, corroborated the two victims' accounts. He testified that he was standing near his brother when he observed Hernandez and Hodgson arguing, and then saw Hodgson pull a gun from his waistband. He further testified that, although he was running away from Hodgson when the shots rang out, he could tell that the shots came from the direction where Hodgson was standing.

Ubaldo Mendoza, Hernandez's father, testified that he later overheard Hodgson talking about the shooting as he waited in a family-court office. Mendoza testified that Hodgson, who was unaware that Mendoza was Hernandez's father, said that he had been looking for Hernandez's brother and became angry when Hernandez refused to divulge her brother's location. Mendoza recounted that Hodgson said that someone in the crowd had yelled, "just shoot the bitch," and that he then shot Hernandez in the leg in order to scare her. Hodgson added that he had shot someone else as well.

Veronica Adamson, who was a friend of Hernandez at the time of the shooting but had fallen out with her by the time of the trial, testified that she had observed the shooting from across the street. She testified that she heard the gunshots but could not see whether anyone had a gun. She also testified that she had heard someone say, "shoot the bitch," but could not identify who said it. Adamson conceded that she had told the police that she heard Hodgson say, "shoot the bitch," and had seen him shoot a pistol. She testified, however, that she had lied to the police in order to help Hernandez. She also testified that she lied to the police by telling them that she had heard Hodgson's group bragging to one another after the shooting; by the time of the trial, she was not sure what she had heard. Adamson acknowledged that she was acquainted with Hodgson and was friends with a few of his friends, and that her friendship with Hernandez had soured after the shooting.

One prosecution witness, Robert Singleton, offered the defense some support. Singleton testified that on the night of the shooting he was sitting in a car parked two or three houses down the street from the one that Hernandez was standing in front of. He saw Hodgson and five or six of his friends walk by, and saw Hodgson begin to argue

with Hernandez. He testified that he heard someone say "shoot this bitch." At that point, someone came out from the side of the house Singleton was parked in front of. Singleton heard two or three gunshots, and when he looked to the side he saw someone dressed in black shooting a firearm. Singleton then ducked down, but he estimated that he heard four or five shots total. Singleton said that he did not see Hodgson shoot anyone. Singleton testified that all of the shots sounded the same, but he conceded that he had previously told the police that it sounded like more than one gun was being fired. He also testified that he did not hear who had said, "shoot the bitch," but acknowledged that he had told the police that Hodgson had said it. He attributed the inconsistency to having overheard other witnesses saying that Hodgson had said, "shoot the bitch." Finally, Singleton testified that he did not see Hodgson shoot anyone.

After presenting these witnesses, the prosecution asked the defense to waive the presentation of the remaining witnesses from the prosecution's pre-trial witness list. The defense agreed, with the exception of Virginia Smith, a witness who had appeared for the first day of trial but was absent on the second. The judge issued a bench warrant for Smith, but she was not located. Hodgson's counsel did not seek an adjournment, and the defense did not offer any witnesses.

Defense counsel's closing argument focused on the physical evidence, which offered some support for Singleton's account of the shooting. Police officers found five shell casings from a 9mm handgun four houses down the street from where Hernandez and Anderson were shot—that is, roughly where Singleton had testified he saw a shooter. No shell casings were found in the area where Hodgson stood during the shooting.

The prosecution's closing argument urged the jury to find that Hodgson had fired the shots at Hernandez and Anderson. The prosecutor acknowledged that the jury could find that shots had been fired from down the street, but he stressed that several witnesses had remembered hearing ten shots, and that only five casings were recovered from down the street. He also urged the jury to convict on an aiding-and-abetting theory, arguing

that Hodgson had encouraged the other shooter, either by yelling, "shoot the bitch," or by drawing his own pistol.

The jury convicted Hodgson on all charges. The trial court sentenced him to a total term of 18 to 42 years' imprisonment.

B.

During his direct appeal to the Michigan Court of Appeals, Hodgson raised a claim of ineffective assistance of counsel, arguing that counsel had erred by failing to locate and present several exculpatory witnesses. As a result, the Court of Appeals remanded the case to the trial court for evidentiary hearings pursuant to *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

1.

Accordingly, between January and May 2001, the trial court held five hearings at which Hodgson presented evidence from several new witnesses. As a general matter, much of the new evidence presented at the hearings tended to implicate another man, Robert Wyatt, as the shooter. Wyatt apparently ran in the same circles as Hodgson. He died in February 1999—after Hodgson's trial but before the evidentiary hearings.

Several of the witnesses at the hearing—namely, Henry Fields, Edwardo Hinton, and his brother Michael Hinton—were friends of Hodgson who had congregated on the night of the shooting at a nearby house, as part of a group that included Hodgson and Wyatt. Fields testified that Hodgson left the group to serve legal papers on Hernandez's aunt, who was the mother of his child, and to confront Hernandez's brother. Fields testified that he followed Hodgson around the corner with Wyatt, whom he had seen shooting a pistol earlier in the evening. They stopped several houses away from where Hernandez and Hodgson were arguing. Wyatt then pulled out his pistol and fired between four and six shots in the direction of Hernandez and Hodgson. Fields testified that he went to jail two days after the shooting and was not contacted by Hodgson's trial counsel. He also stated that he would have testified at Hodgson's trial had he been asked.

Edwardo Hinton testified that he was part of a group of friends who accompanied Hodgson to the site of the shooting. He testified that he could see that Hodgson was not armed when the shots were fired. As Hinton ran away, he encountered Wyatt holding a gun in his hand. Hinton also testified that he had seen Wyatt with a gun earlier in the evening. Hinton testified that he did not come forward with this information prior to trial because he was incarcerated shortly after the shooting. He indicated, however, that he would have testified had he been asked. Michael Hinton testified that he saw Wyatt with a gun in his pocket after the shooting, and that he had seen Wyatt with a gun earlier in the evening. He also testified that, earlier in the evening, Wyatt had said that he planned to "do something."

Another witness, Joseph Probe, recounted a car ride with Wyatt in July 1998. During that car ride, Probe testified, Wyatt admitted that he had fired shots into the crowd that had gathered around Hodgson, because he thought that Hodgson was in danger. Wyatt then asked Probe to pressure witnesses not to testify at Hodgson's trial, because he feared that they might implicate him in the shooting. Probe also testified that he left the state a few days after his conversation with Wyatt, because he had violated the conditions of his parole. He did not go to the police or tell Hodgson about his conversation with Wyatt.

Hodgson also presented testimony from Vicki Close, an employee of the Michigan Department of Corrections. She testified that, as part of her job, she had read mail sent to Hodgson's brother, Michael, while he was incarcerated. She recounted reading two or three letters, signed by "Rob," in which the writer apologized that Hodgson had been charged for a shooting that the writer had committed. Close testified that the letters probably arrived in 1999.

Hodgson also called Virginia Smith, who had been designated as a prosecution witness at trial but failed to appear. Smith testified that she was with a group of her friends, including Hernandez, when Hodgson arrived with a group of his friends. Smith testified that when the shooting started she was roughly two feet away from Hodgson. She could see his hands and she could see that he did not have a gun. Smith testified that

shots came from down the street. She also testified that she spoke with Hernandez shortly after the shooting. According to Smith, Hernandez said that she was not sure who had shot her because she could not see. Smith testified that she heard someone say, "shoot this bitch," just after the shooting started. She explained that she missed the second day of Hodgson's trial because she had gotten drunk the night before and was too hung over to wake up the next morning. She stated that she was never contacted by Hodgson's trial counsel.

Hodgson's trial counsel, Kerri Mitchell, also testified. Mitchell was unable to recall many details of his representation of Hodgson. Mitchell did recall having several conversations with Hodgson about trial strategy and what witnesses to call, but could not remember any specific details of those conversations. He had been unable to review the record to refresh his recollection, because he had given his case file to another lawyer after Hodgson's conviction. He suggested that Hodgson himself might have had a better memory of those conversations.

2.

The trial court rejected Hodgson's ineffective-assistance claim. The court found that Hodgson had not demonstrated that Mitchell knew about the witnesses about whose omission he complained, or that Mitchell could have located the witnesses through reasonable efforts. The court noted that Hodgson had presented no evidence that he had given Mitchell the names of any of the eyewitnesses. The court also noted that several of the witnesses were incarcerated during the trial, that one had fled the state as a result of a parole violation, and that some might have been afraid to come forward. The only exception was Virginia Smith, who had been named as a prosecution witness. But the court reasoned that Mitchell could not be blamed for failing to call Smith, because she had absented herself from the trial. And as to Mitchell's trial strategy, the court concluded that Mitchell had made a reasonable choice to focus his arguments on the physical evidence.

The Michigan Court of Appeals affirmed in February 2002. With regard to Hodgson's ineffective-assistance claim, the court reasoned that "the record is devoid of

any evidence that Mitchell was made aware of or could have discovered the witnesses who would have allegedly identified Wyatt as the shooter." The court also concluded that Mitchell had followed a reasonable strategy in focusing on the physical evidence. The court further held that Mitchell was not to blame for failing to present Virginia Smith's testimony at trial, because she failed to appear after being subpoenaed. Moreover, the court concluded, the absence of Smith's testimony was not prejudicial because it would have been cumulative of other testimony to the effect that Hodgson did not have a gun. Finally, the court rejected Hodgson's state-law request for a new trial on the basis of newly discovered evidence.

One judge concurred in the judgment. She reasoned that the evidence produced at the evidentiary hearings would not have affected the outcome of Hodgson's trial, in light of "the testimony at trial regarding the number of shots fired and the statements attributed to defendant" and the fact that "the case was submitted to the jury on an aiding and abetting theory" in addition to the theory that Hodgson was the shooter.

The Michigan Supreme Court denied Hodgson's application for leave to appeal in December 2002.

## C.

In October 2003, Hodgson filed a motion for relief from judgment with the state trial court. Among other things, his motion sought to bolster his ineffective-assistance claim with additional evidence and to assert another claim for a new trial on the basis of newly discovered evidence.

## 1.

With regard to his ineffective-assistance claim, Hodgson proffered the affidavit of Theresa Rose-Demni, an eyewitness who had been interviewed by an investigator retained by Hodgson's appellate counsel in anticipation of the state-court evidentiary hearings. In her statement to the investigator, Rose-Demni explained that she was a friend of Hodgson and that she had witnessed the shooting from a spot on the sidewalk near Hernandez and Anderson. According to Rose-Demni, Wyatt opened fire from

down the street after Daniel Note, a member of Hodgson's group, had said to "shoot the bitch." Rose-Demni saw Hodgson duck and run after the shooting began, and did not see him draw a gun. She recalled hearing approximately six to eight gunshots coming from down the street. In her statement, Rose-Demni stated that she did not come forward during Hodgson's trial because she was afraid that Wyatt would retaliate against her. After Hodgson was convicted, however, she went to the police in an attempt to exonerate him. In her affidavit, Rose-Demni added that she had contacted Mitchell and expressed her willingness to testify on Hodgson's behalf, but that Mitchell never contacted her about testifying. She also attested that she had moved away from Michigan in October 1999 and thus had not known about the evidentiary hearings taking place in Hodgson's case.

Hodgson proffered four other affidavits in support of his bid for a new trial. Three witnesses—Shawn Deese, Alma Smith, and Melissa Romberg—all claimed to have heard Hernandez admit that Hodgson had not shot her and that she had fabricated her trial testimony. The fourth witness—Dawn Williams—claimed that Anderson had told her that he knew that Hodgson had not done the shooting, but that he and others planned to identify Hodgson as the shooter because they did not like him and hoped to get him out of the neighborhood. Williams also attested that, after Hodgson was convicted, Wyatt twice admitted to her both that he was the shooter and that Hodgson had been convicted for something Hodgson did not do.

2.

Without holding an evidentiary hearing, the trial court denied Hodgson's motion for relief from judgment. With regard to the new-trial claim, the court reasoned that Hodgson had failed to show that the new evidence was not previously discoverable through due diligence. It added that the witnesses' delay in coming forward made it unlikely that their testimony would lead a jury to acquit in a retrial.

The court held that Hodgson's ineffective-assistance claim relating to Rose-Demni's testimony was procedurally barred, because it should have been included in his prior appeal. Hodgson sought to excuse the delay by asserting a claim that his appellate

counsel was ineffective. The trial court found, however, that appellate counsel had intended to call Rose-Demni at the evidentiary hearing, but that she moved away without leaving a forwarding address. The court thus concluded that appellate counsel was not ineffective, since he had done "everything in his power to present" Rose-Demni's testimony.

In June 2005, the Court of Appeals summarily denied Hodgson's application for leave to appeal, stating that he did not "meet the burden of establishing entitlement to relief under" Michigan Court Rule 6.508(D). The Michigan Supreme Court denied review on the same basis in November 2005.

### D.

In March 2006, Hodgson filed this habeas corpus action in the district court. He raised three claims: that his trial counsel, Mitchell, had provided constitutionally deficient representation; that the admission of certain evidence relating to prior bad acts deprived him of a fair trial; and that the trial court denied him due process by failing to grant him a new trial on the basis of the affidavits he had submitted.

The district court granted the writ without holding an evidentiary hearing, based principally on Hodgson's ineffective-assistance claim. Relying on the evidence produced during the state-court evidentiary hearings, as well as Rose-Demni's affidavit, the district court held that the state courts had unreasonably concluded that Hodgson could not show deficient performance or prejudice stemming from Mitchell's failure to investigate and call witnesses. The district court rejected Hodgson's prior-bad-acts claim, but held that Hodgson was also entitled to relief on his new-trial claim.

This appeal followed.

### II.

We review de novo the district court's decision to grant habeas relief. *See Stewart v. Wolfenbarger*, 595 F.3d 647, 652 (6th Cir. 2010). The district court did not hold an evidentiary hearing, so it did not make any factual findings to which we could

defer.  *See Hayim v. Mitchell*, 492 F.3d 680, 689 (6th Cir. 2007).  The state courts' factual findings, by contrast, are presumed correct and may be rebutted only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A.

The district court's primary ground for granting the writ was that Hodgson had received ineffective representation from his trial counsel, Kerri Mitchell.  To make out that claim, Hodgson must demonstrate both "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  As to the first requirement, he must show "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  As to the second, he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  And because the Michigan Court of Appeals rejected Hodgson's ineffective-assistance claim on the merits, Hodgson faces the added burden of showing that the Court of Appeals' conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The district court faulted Mitchell for failing to locate and call a number of witnesses.  But Hodgson has failed to present any evidence that Mitchell knew or should have known about several of the witnesses about whose omission he complained—namely, the Hinton brothers, Joseph Probe, Henry Fields, and Vicki Close, each of whom (according to their testimony at the state-court evidentiary hearings) would have tended to implicate Wyatt as the true shooter.

The point is clearest with regard to Close's testimony.  As the Michigan Court of Appeals observed, Close testified that she did not discover the letters purportedly sent by Wyatt until 1999, after Hodgson's trial had ended.  It would have been impossible for Mitchell to identify Close as a witness prior to trial, so it was error for the district court to rely on Close's testimony in concluding that Mitchell had performed deficiently.

The other four witnesses in this category present a closer question. In holding that their testimony could not support an ineffective-assistance claim, the Court of Appeals appeared to rely heavily on Hodgson's failure to prove that he had told his lawyer about Probe, Fields, and the Hintons. And we have held that counsel cannot be charged with ineffective representation when his failure to locate exculpatory evidence is "directly attributable to [a defendant's] refusal to cooperate, rather than any insufficiency in the investigation" conducted by counsel. *Fautenberry v. Mitchell*, 515 F.3d 614, 625 (6th Cir. 2008). But we have also held that a defendant's lack of cooperation could not "exonerate [defense counsel's] consistent pattern of neglecting his essential function of investigating the claims against his client." *White v. McAninch*, 235 F.3d 988, 987 (6th Cir. 2000).

Regardless of whether the Court of Appeals's precise rationale is correct, however, we think its broader point is sound. It was Hodgson's burden to demonstrate that Mitchell's performance was deficient. *See Strickland*, 466 U.S. at 688 ("*the defendant must show* that counsel's representation fell below an objective standard of reasonableness") (emphasis added). At the evidentiary hearing, Mitchell said that he recalled discussing trial strategy and witnesses with Hodgson, but could not recall the content of those conversations. He suggested that Hodgson might have a better recollection of their conversations than he did. After all, in the meantime, Mitchell had taken roughly one hundred cases to trial, whereas Hodgson had presumably been involved in only one. And yet—notwithstanding Hodgson's burden of proving that Mitchell should have found the witnesses, and the fact that most of the witnesses were Hodgson's friends, not Mitchell's—Hodgson himself did not testify on that subject or any other. Under these circumstances, it was hardly unreasonable for the Court of Appeals to conclude that Hodgson did not meet his burden of showing that Mitchell should have discovered these witnesses.

But Virginia Smith's testimony presents a different question. Although the record is not clear on the point, the State conceded at oral argument before our court that Mitchell "knew what the substance of [Smith's] testimony was going to be." (It is

possible that Mitchell would have been charged with that knowledge in any event, *see Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005), but we do not address that issue here.) For our purposes, then, Mitchell knew that Smith would have testified that she was within a few feet of Hodgson during the shooting, that she could see his hands, and that she could *confirm* that he was not holding a gun.

In rejecting Hodgson's ineffective-assistance claim as it pertained to Smith's testimony, the Court of Appeals first reasoned that Mitchell was not at fault in failing to call her, because she had absented herself from the trial. With respect, we do not think that reason can support the court's conclusion. Smith had no obvious motive to lie, and her testimony, if believed, would have directly refuted the State's theory that Hodgson was the shooter. Under the circumstances, one would have expected a reasonably competent defense attorney to do as much as humanly possible to ensure that the jury heard Smith's testimony. But it appears that all that Mitchell did was refuse the State's request to waive the presentation of Smith as a witness. That step did cause the court to issue a bench warrant to secure Smith's presence. But there is no indication that Mitchell sought to delay the proceedings until Smith could be found, and the jury began deliberating just three hours after the warrant was issued. In state court, Hodgson argued that Mitchell was ineffective for, among other things, not seeking an adjournment of the trial until Smith could be located. Yet the Court of Appeals did not address that argument. In light of the important exculpatory evidence Smith could have provided had she testified, it seems plain to us that Mitchell acted deficiently in failing to at least seek an adjournment.

Contrary to the Court of Appeals' suggestion, we do not see how Mitchell's failure to call Smith as a witness can be defended as a strategic decision. That Mitchell refused the prosecution's request to waive Smith as a witness makes clear that he did not make a strategic choice to forgo her testimony. His error was in failing to take further reasonable steps to ensure that she did testify. The Court of Appeals' conclusion that Hodgson did not demonstrate deficient performance was unreasonable within the meaning of the habeas statute.

The Court of Appeals also held that, even if Smith had testified at trial as she indicated at the evidentiary hearing, her testimony would have been cumulative. We respectfully disagree. It is true that both Adamson and Singleton testified that they did not see Hodgson with a gun when the shooting began. And Singleton testified that he saw shots fired from down the street, rather than from where Hodgson was standing. But Adamson and Singleton testified only that they did not see Hodgson with a gun. Smith, by contrast, would have testified that she was within a few feet of Hodgson during the shooting and that she could *confirm* that he was not holding a gun. Moreover, Smith's vantage point would have made her a better witness than Singleton, who was parked in a car four houses down the street, and who ducked when shots were first fired. She also would have been a more credible witness than Adamson, who was impeached by her prior statement to the police that she had seen Hodgson with a gun. In addition, Smith would have been the only witness to testify that Hernandez had been unable to identify her assailant shortly after the shooting. Smith's testimony would not have been merely cumulative.

That conclusion does not itself establish that Hodgson met *Strickland*'s prejudice requirement. To do so, Hodgson must demonstrate a "reasonable probability that . . . the result of the proceeding would have been different" had Smith testified at trial. *Strickland*, 466 U.S. at 694. In this context, we consider not only the evidence omitted as a result of attorney error, but also "the totality of the evidence" in the case. *Id.* at 695. "[A] verdict . . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

In some respects, the prosecution's case here was strong. Most notably, Hodgson was effectively identified as the shooter by several eyewitnesses. But the strength of the prosecution's case was undermined by the physical evidence, which fit poorly with the witnesses' accounts. In light of that weakness in the prosecution's case and the manifest exculpatory value of Smith's testimony—testimony that, if believed, would have impeached the government's eyewitnesses—we think it was unreasonable for the Court

of Appeals to conclude that Hodgson had not shown a "reasonable probability that . . . the result of the proceeding would have been different." *Id.* at 694.

That the State also asked the jury to convict on an aiding-and-abetting theory does not alter our conclusion. As an initial matter, the evidence supporting that theory was not overwhelming. True, several witnesses testified that someone had yelled out something to the effect of "shoot the bitch" shortly before the shots were fired. But at trial, Scott Anderson was the only one who attributed the statement to Hodgson. (Two other witnesses told the police that they heard Hodgson make the statement, but they recanted at trial.) Moreover, the evidence supporting the aiding-and-abetting theory was not independent from the evidence supporting the prosecution's theory that Hodgson was the shooter. In particular, Anderson testified not only that he heard Hodgson yell, "shoot the bitch," but also that he saw Hodgson pull out a gun just before the shots were fired. Although Smith's testimony would have directly contradicted Anderson's only as to the latter point, in doing so it would have placed into question his credibility and ability to recollect what happened that night. In short, Smith's testimony—if believed—would have powerfully undercut both of the prosecution's theories of the case.

B.

In addition to holding that Hodgson had demonstrated ineffective assistance of counsel, the district court also held that Hodgson was entitled to a new trial on the basis of newly discovered evidence that tended to show he was actually innocent of the crimes for which he was convicted. The district court's conclusion rests on a mistaken premise, and conceivably could have some lingering effect on the case going forward. So we briefly address the issue.

The district court reasoned that proof of a constitutional violation (here, ineffective assistance of counsel) can serve as a gateway for a freestanding claim of actual innocence. The law is actually the reverse: "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *see also Murray v. Carrier*, 477 U.S. 478,

496 (1986) (holding that a procedural default in state proceedings may be excused "where a constitutional violation has probably resulted in the conviction of one who is actually innocent"). The *Herrera* Court did assume for the sake of argument "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." 506 U.S. at 417; *cf. In re Davis*, ___ U.S. ___, 130 S. Ct. 1, 1 (2009) (transferring an original habeas petition brought by a capital prisoner to a district court, with instructions to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence"). But Hodgson's case is not a capital one.

*      *      *

The district court's judgment is affirmed.