RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ODRAYE G. JONES, n/k/a Malik Allah-U-Akbar,

　　　　　　　　*Petitioner-Appellant*,

*v.*

MARGARET BRADSHAW, Warden,

　　　　　　　　*Respondent-Appellee.*

⎫
⎪
⎪
⎬  Nos. 07-3766/15-4308
⎪
⎪
⎭

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:03-cv-01192—David A. Katz, District Judge.

Argued:  May 12, 2022

Decided and Filed:  August 22, 2022

Before:  MOORE, COLE, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Kathryn Bailey, FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF PENNSYLVANIA, Pittsburgh, Pennsylvania, for Appellant.  Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:** Kathryn Bailey, FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF PENNSYLVANIA, Pittsburgh, Pennsylvania, for Appellant.  Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

A jury convicted petitioner Odraye Jones of capital murder. During the penalty phase, Jones's counsel presented testimony from a clinical psychologist who diagnosed Jones with Antisocial Personality Disorder. The psychologist testified that Black men with this disorder (including Jones) would commit more murders—he claimed that about one in four "African-American urban males" suffered from the disorder, and the only treatment for them was to "throw them away, lock them up." After hearing this testimony, the jury recommended the death penalty. The court accepted the recommendation and sentenced Jones to death.

Jones challenged his conviction and sentence through direct appeal and post-conviction review in Ohio's courts, all of which affirmed the conviction and sentence. He then sought federal habeas relief. The district court denied Jones's petition for a writ of habeas corpus, his proposed amendment to that petition, and a motion for relief from judgment filed pursuant to Federal Rule of Civil Procedure 60(b). We heard argument on thirteen issues certified for appeal from these orders and will affirm the district court's judgment on all thirteen.

But after that argument, we issued a separate certificate of appealability for an additional issue: whether Jones received ineffective assistance of counsel during the penalty phase because his attorneys failed to prepare expert witnesses properly, as shown by the psychologist's racialized testimony. We hold that this issue is not procedurally defaulted, and that on our de novo review of the merits, trial counsel performed ineffectively by presenting racialized evidence during the penalty phase. Jones is entitled to a new sentencing. Accordingly, we remand the case to the district court with instructions to issue a writ of habeas corpus vacating Jones's death sentence unless the State of Ohio conducts a new penalty phase proceeding within 180 days of remand.

I.

A.

Petitioner Odraye Jones[1] was tried and convicted for the murder of Officer William D. Glover, Jr., of the Ashtabula City Police Department.  On direct appeal, the Ohio Supreme Court summarizes the facts of the case as follows:

> On November 17, 1997, a dispatcher for the Ashtabula City Police Department advised officers that appellant Odraye G. Jones, an individual with outstanding felony warrants, had been spotted in the 900 block of West 43rd Street in Ashtabula.  A week earlier, appellant had told his cousin, Jimmie Lee Ruth, that he "was facing a lot of time for robbing Isaac Coleman" and that he "was going to shoot at the police if they ever tried to arrest him."

> Officer William D. Glover, Jr., responded to the dispatcher's call.  Officer Glover found appellant with a friend, Anthony Gene Barksdale, and Jimmie Lee Ruth walking together on West 43rd Street.  Officer Glover followed the three men to the home of one of their friends, Flo Chapman.  Barksdale knocked on the door of the Chapman home while Ruth and appellant stood behind him on the porch.  Officer Glover approached the Chapman home, got out of his car, and beckoned to appellant.  Ruth testified that Officer Glover told appellant, "[C]ome on, you know why I'm here.  I don't want no problem.  I'm just doing my job."  Appellant jumped off the side of the porch and began running down the side of the Chapman home.  Officer Glover pursued him.  Not long after the pursuit commenced, appellant turned around, pulled a .38 caliber revolver from his pocket, and began firing shots at Officer Glover.

> After firing the first shot, appellant began to approach Officer Glover, firing several more shots.  Officer Glover fell to the ground.  Appellant turned and fled. He ran to a nearby fence and began to climb through a hole in it.  Appellant then stopped, turned around, and ran back to where Officer Glover lay.  Appellant kicked Officer Glover in the chest.  The kick was done with such force that it left a large bruise on Officer Glover's chest that was visible to the paramedics who later treated Officer Glover at the scene.  After kicking Officer Glover, appellant fled the scene.

> As Officer Glover was pursuing appellant, another Ashtabula City Police Officer, Robert Stell, was en route in his patrol car.  Officer Stell located appellant several blocks away from the scene of the shooting, still running.  Officer Stell got out of his car and ordered appellant to stop.  Appellant ignored the command and continued running.  Officer Stell pursued appellant on foot.  Appellant led Officer

---

[1]During federal habeas proceedings, petitioner legally changed his name to Malik Allah-U-Akbar.  For purposes of clarity and continuity, we continue to refer to petitioner by his former name.

Stell into a nearby apartment complex. He stopped at the door of an apartment and began attempting to force his way inside. While appellant managed to squeeze part of his body through the door, the occupant of the apartment prevented appellant from fully entering. As appellant was struggling to enter the apartment, Officer Stell began to approach appellant. Officer Stell drew his weapon and ordered appellant to the ground. Appellant did not immediately respond. Appellant threw his revolver behind him. The gun landed in some nearby shrubbery. Officer Stell again ordered appellant to the ground and, this time, appellant complied. Officer Stell held appellant at gunpoint until assistance arrived. Officers recovered the weapon and appellant was placed under arrest. This gun was later matched to fired cartridge casings recovered at the scene of the shooting, live cartridges found on appellant at the time of his arrest, and bullets taken from Officer Glover's body. All of the ammunition was hollow point. This type of ammunition is designed to open up on impact, causing larger wounds.

Officer Glover had sustained gunshot wounds to the top of his head and to the area just below his right eye. He also sustained a bullet wound to his right shoulder. The gunshot wound to the top of Officer Glover's head and the wound to his face were both fired from a distance of less than one foot. The suddenness of appellant's attack had apparently caught Officer Glover by surprise. Officer Glover's duty weapon was found in Officer Glover's holster. The holster's strap was snapped securely shut.

Paramedics transported Officer Glover to Ashtabula County Medical Center for emergency treatment. After Officer Glover's condition had been stabilized, he was life-flighted to Cleveland's Metro–Health Hospital. X-rays and CT scans revealed substantial damage to Officer Glover's brain. Officer Glover had severe cerebral swelling and profuse bleeding from his nose and mouth. Neurological assessments revealed minimal brain stem function. Officer Glover died from his gunshot wounds the following morning, November 18, 1997.

*State v. Jones*, 744 N.E.2d 1163, 1169–70 (Ohio 2001).[2]

Shortly thereafter, Jones was indicted for aggravated murder with specifications for killing Officer Glover for the purpose of escaping apprehension and for knowingly and purposefully causing the death of a law enforcement officer. *Jones v. Bradshaw*, 489 F. Supp. 2d 786, 793 (N.D. Ohio 2007). The trial court found Jones to be indigent and appointed David Doughten and Robert Tobik to represent him.

---

[2]We defer to the state court's factual findings and presume they are correct, absent a showing of clear and convincing evidence to the contrary. *See Hodgson v. Warren*, 622 F.3d 591, 598 (6th Cir. 2010).

Trial began just six months after Jones was indicted. And during that time, the relationship between Jones and his appointed counsel deteriorated. Two hours after the jury was sworn in, attorney David Per Due filed an entry of appearance, having been retained by Jones's family that day. The trial court held a hearing the following day to discuss the status of Jones's representation. But after hearing from Jones and the attorneys, the court denied Jones's motions for Per Due to substitute as counsel and for a continuance, finding that Jones's relationship to his court-appointed counsel had not broken down beyond repair and that the request for a continuance was made in bad faith and for purposes of delay. The trial proceeded as scheduled with Doughten and Tobik representing Jones.

At the close of trial, the jury found Jones guilty of aggravated murder. During the penalty phase, the court explained to the jury that they had four sentence options: (1) life in prison without parole eligibility for 25 years; (2) life in prison without parole eligibility for 30 years; (3) life in prison without the possibility of parole; or (4) death.

Jones presented extensive evidence of his social history of neglect and trauma, including testimony and records about his mother, Darlene, to establish mitigating circumstances. Trial counsel also presented expert evidence from local clinical psychologist Dr. James Eisenberg, which we focus on for this appeal.

Dr. Eisenberg interviewed Jones six times before trial, for approximately 14 hours total. In his written report, which he sent to trial counsel in the middle of trial, Dr. Eisenberg noted that Jones had "possible neuropsychological impairment," and he "should therefore be evaluated for such impairment." Dr. Eisenberg found Jones "surprisingly intelligent and articulate," despite acknowledging that an IQ of 86 "place[d] him in the low average range of intelligence." Dr. Eisenberg conducted "a test designed to assess a number of the major patterns of personality and emotional disorders" on Jones but concluded that his answers were "self-contradictory and rarely given," so the test results were "not valid."

Dr. Eisenberg diagnosed Jones with "Antisocial Personality Disorder with features of attachment disorder" based on "overwhelming" evidence. Dr. Eisenberg noted that there was a "first-degree biological" risk from Jones's "equally antisocial and drug dependent mother."

Despite referring to Jones's deceased mother, Darlene,**3** as a baseline, Dr. Eisenberg did not review Darlene's medical records; instead, he reviewed criminal "Docket Summaries" about Darlene. Dr. Eisenberg ultimately concluded that "[Jones's] behavior reflects his survival instincts and his personality reflects the lack of effective empathy and moral development."

During the penalty phase, trial counsel began by saying that "Odraye Jones was not born bad." But, counsel explained, Jones was "just kind of ang[ry] and bitter at the world. Not even sure why." Counsel explained that Dr. Eisenberg "is going to try to explain the effect of having no close family relationships, no proper guidance, no nurturing from day one, the [e]ffect it might have."

Dr. Eisenberg testified that he had diagnosed Jones with Antisocial Personality Disorder (APD), which he defined as "someone that engages in a wide variety of misconduct beginning in early to mid[-]adolescence continuing to violate the rights of others and to engage in conduct which normally would be considered to either be illegal or exploitative in some way." He stated that APD can occur "in the environment of dysfunction, lack of effective role modeling, access to criminal conduct, lack of appropriate discipline and continuing to act out in antisocial ways." Dr. Eisenberg called APD "an easy disorder to diagnose," and testified that "overwhelming" evidence showed that Jones suffered from APD. He explained to the jury that he reached this diagnosis "based on review of [Jones's] juvenile records, his first contacts with the Juvenile Court system in 1990. His behavior as a juvenile and then continuing on his behavior as an adult and the conflicts he's had with the court as an adult and more importantly, you know, [the *Diagnostic and Statistical Manual of Disorders*, Fourth Edition] is a guideline for this diagnosis." In other words, Dr. Eisenberg's diagnosis was based largely on Jones's criminal record.

Dr. Eisenberg went on to testify that "to be antisocial means that you violate the rights of others; that you take advantage of others; you steal from others. That you don't have a sense of empathy for what it means to cause harm[.]" An individual with APD has a "need for immediate gratification which puts aside rational thinking," the consequence of which is the involvement in

---

**3**Darlene committed suicide by drug overdose when Odraye was 13 years old.

"a lot of what we call unmotivated antisocial behavior, anything minor from shoplifting to trespassing to more major crimes of criminal conduct to arson . . . [and] murder . . . ."

Dr. Eisenberg testified that APD is curable, but he also testified that shortly after Darlene's death, it was "too late to make any effective real change in [Jones's] life." In Dr. Eisenberg's view, the "best treatment [for someone with APD] is to keep them away from others. . . . [T]he best treatment for the antisocial, if the violations are severe, is to throw them away, lock them up[.]" He emphasized this point again later in his testimony: "We're talking about [a] pervasive pattern of behavior that runs the risk of engaging in serious criminal conduct and, if you're not stopped, ultimately most antisocials are likely to run the risk of the kind of situation [Jones is] in right now."

On cross-examination, Dr. Eisenberg agreed that "in the general population one to three percent of the general population can be diagnosed with [APD]" but that in "urban African American males," the percentage was much higher, "15 to 25 percent, maybe even 30 percent[.]" And on re-direct, defense counsel had the following exchange with Dr. Eisenberg:

> Q. There was some testimony about although the percentage used by [the prosecutor] was 15 to 20 percent of the African American urban males have been diagnosed and very few actually commit a homicide. Do you remember those questions?
>
> A. Yes.
>
> Q. Is it your opinion that more could result but it's just the happenstance they're placed in that either causes it or has it not happen?
>
> A. **The statistics are that one out of four African males of the age 25 are incarcerated in some capacity or on some kind of strict probation. So that would eliminate those individuals from engaging in this conduct. So part of it is incarceration itself that precludes homicide.**

(Emphasis added.) Then, on re-cross, Dr. Eisenberg agreed that APD is "common among people in jail, in prison," "[c]ommon among murderers," and testified that thirty percent of "murderers on death row" had APD.

In closing, the prosecutor cited Dr. Eisenberg's testimony to argue that "perhaps some people are born bad." And defense counsel reiterated the prevalence and incurability of APD in Black men:

I think it's a quarter of the urban males, I don't know the statistics, come up with, urban [B]lack American youth, come up with [APD]. Is that surprising? A number of people in prison with this. Is that surprising? And Dr. [Ei]senberg said it's really untreatable. This isn't a situation you can treat. This is something that we can't say give him some treatment. It's untreatable; you have to put him out of society until it runs its course.

After deliberating, the jury found that the aggravating circumstances outweighed the mitigating factors and recommended that Jones be sentenced to death. The trial court held a sentencing hearing, accepted the jury's recommendation, and imposed a death sentence.

Jones timely appealed the judgment, raising fifteen assignments of error. Ultimately, the Supreme Court of Ohio rejected Jones's arguments, affirmed the judgment of the trial court, and upheld the death sentence. *State v. Jones*, 744 N.E.2d at 1170–71.

Jones also collaterally attacked his conviction, but the trial court denied his petition and Ohio Court of Appeals affirmed. *State v. Jones*, No. 2000-A-83, 2002 WL 737074, at *8 (Ohio Ct. App. Apr. 26, 2002). The Ohio Supreme Court denied Jones's petition for review, *State v. Jones*, 774 N.E.2d 767 (Ohio 2002) (table op.), and later denied his motion to reopen his direct appeal, *State v. Jones*, 841 N.E.2d 315 (Ohio 2006) (table op.).

B.

In 2003, Jones filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Ohio and later amended his petition with assistance of counsel. The district court denied Jones's amended petition but certified for appeal five of his claims. *Jones*, 489 F. Supp. 2d at 849–52. We then expanded the certificate of appealability (COA) on Jones's motion to include a challenge to Ohio's lethal injection protocol. Six months later, we remanded the case to the district court on Jones's motion for "limited discovery and factual development" of his lethal injection challenge. And six years after that, while the case remained in the district court, Jones returned to our court and requested that we "expand the limited remand" so that he could file an "Amendment and Supplement" to his § 2254 petition. We granted his motion, authorizing the district court to consider Jones's assertion that there was cause to excuse his procedural default of additional claims under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).

Accordingly, Jones filed his Amendment and Supplement with the district court and argued that those cases allowed him to amend his petition to include some additional claims.

In 2015, the district court concluded proceedings related to Jones's lethal injunction protocol by transferring the action back to our court. In a separate order, the district court also rejected the claims brought in Jones's Amendment and Supplement. The court first reasoned that Federal Rule of Civil Procedure 60 applied, rather than Rules 15 or 59(e), because judgment was entered before Jones filed his Amendment and Supplement, and the mandatory twenty-eight-day period for filing a Rule 59(e) motion had passed. Under the Rule 60(b) standard, the district court concluded that the claims brought in Jones's supplement were not cognizable because they were not based on newly discovered evidence and did not fit within the narrow confines for which *Martinez* and *Trevino* authorize courts to set aside procedural default caused by ineffective postconviction counsel. Jones filed a notice of appeal after the district court's rejection of his supplement and later filed an application for a COA in the district court. The district court granted a COA on eight additional issues arising out of the Amendment and Supplement.

Thereafter, Jones filed a Rule 60(b) motion in the district court, claiming that the district court had erred in its resolution of three of the claims presented in his original habeas petition.[4] The Warden responded that Jones's motion should be transferred to our court as an application to file a second or successive habeas petition because the claims had not actually been presented in Jones's petition for habeas relief. We held the appeal in abeyance while the district court resolved the motion. In May 2019, the district court granted in part the Warden's motion by characterizing a portion of Jones's motion as a second or successive habeas petition and sending two of the claims to our court under 28 U.S.C. § 2244. It denied relief on the remaining claim, which had alleged that Jones's counsel was ineffective for introducing racialized evidence during the sentencing phase of his trial, because it concluded that claim was procedurally defaulted.

---

[4]Jones's motion requested that the district court follow the procedure outlined in *First Nat'l Bank of Salem v. Hirsch*, 535 F.2d 343 (6th Cir. 1976), by issuing a provisional order if it were inclined to grant his motion. The district court did not follow the *Hirsch* procedure.

Jones then filed a motion in the first-in-time appeal to expand the COA to include the denial of his Rule 60(b) motion and filed a separate notice of appeal arising out of the district court's denial of his racialized evidence claim, which was docketed as Case Number 19-3611. Although both these filings dealt with the same subject, we granted in part Jones's request for an expanded COA and ordered the parties to file supplemental briefs on Jones's Rule 60(b) claim raising ineffective assistance of counsel based on presentation of racialized evidence in Case Number 07-3766, while also dismissing as untimely Jones's separate appeal in Case Number 19-3611. We also denied Jones's corrected application for authorization to file a second or successive habeas petition.

And finally, we sua sponte granted a COA on one additional issue: whether trial counsel were ineffective during the penalty phase of trial for failing to properly prepare expert witnesses, based on Dr. Eisenberg's presentation of racialized testimony.**[5]**

C.

In sum, we must resolve issues arising from three separate COAs.

First, Jones's appeal of the district court's order denying his first-in-time habeas petition remains pending with a COA on the following issues: (1) whether the trial court erroneously submitted an "acquittal-first" instruction to the jury; (2) whether the trial court erred when it denied Jones's request to have counsel of his choosing; (3) whether trial counsel were ineffective for failing to highlight certain information during the mitigation phase; (4) whether trial counsel were ineffective for failing to investigate and present mitigating evidence; and (5) whether trial counsel were ineffective because animosity existed between Jones and his counsel. *See Jones*, 489 F. Supp. 2d at 850–52.

Second, the district court granted COAs on eight issues related to its order denying relief from Jones's Amendment and Supplement: (1) whether the district court failed to comply with

---

**[5]**This COA framed the claim as whether trial counsel were ineffective for failing to "properly prepare expert witnesses *or* to present proper mitigation evidence" at the penalty phase. (Emphasis added.) The mitigation-evidence issue was already before our court on Jones's appeal of the district court's order denying his first-in-time habeas petition and is discussed *infra* at § III.C. Thus, this COA granted review for only one new issue: ineffective assistance of counsel based on Dr. Eisenberg's racialized testimony.

the mandate of the court of appeals to allow the filing and full consideration of supplemental or amended pleadings related to the ineffective assistance of trial counsel; (2) whether Federal Rule Civil Procedure 15 applies to Jones's proposed amendment to his habeas petition, when it was filed after the notice of appeal but prior to appellate review and with permission from the court of appeals; (3) whether the district court correctly denied the claims of counsel's ineffectiveness concerning an eyewitness's testimony identifying Jones as the shooter and her initial statement to the police identifying Anthony Barksdale as the shooter; (4) whether trial counsel were ineffective for failing to offer compelling and available evidence demonstrating that a change of venue was necessary to protect Jones's constitutional right to a jury composed of a fair cross section of his community; (5) whether *Martinez* applies to claims other than trial counsel ineffectiveness that state post-conviction counsel overlooked, and whether Jones's claim that he was denied his constitutional right to a public trial is cognizable despite no procedural default; (6) whether the interests of justice would best be served by considering additional evidence in reviewing the counsel-of-choice claim; (7) whether Jones made a sufficient showing to warrant discovery; and (8) whether Jones was entitled either to be represented by different counsel in his motion for the appointment of counsel or to proceed pro se.[6]

And third, we must consider whether trial counsel were ineffective during the penalty phase of trial for failing to properly prepare expert witnesses, based on Dr. Eisenberg's presentation of racialized testimony.

We address the fourteen issues before us roughly in that order.

## II.

Before we take up any of the substantive claims for habeas relief that Jones has presented, we must first consider issues relating to his representation. Several times through these proceedings, Jones asked the district court and our court to appoint him new counsel or allow him to proceed pro se. In February 2016, Jones's counsel filed a "Motion for the Appointment of Counsel to Argue Petitioner's Requests for New Counsel and/or to Proceed Pro Se" in the district court. The district court denied that motion as moot because we had already

---

[6]The eighth issue was resolved by the district court in a separate order.

issued an order denying a motion Jones filed with us to remove his counsel and proceed pro se. Jones now argues that the district court abused its discretion by not appointing him new counsel for the limited purpose of arguing in favor of new habeas counsel, or for Jones to proceed pro se.

In death penalty cases where counsel have been appointed to represent indigent defendants under 18 U.S.C. § 3599, district courts apply the "interests of justice" standard when determining whether to substitute appointed counsel. *See Martel v. Clair*, 565 U.S. 648, 652 (2012). Section 3599 contemplates that an attorney appointed under its authority may be "replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant." 18 U.S.C. § 3599(e); *see also Clair*, 565 U.S. at 657. But defendants do not have "the right to counsel of their choice." *Christeson v. Roper*, 574 U.S. 373, 377 (2015).

Jones relies on *Christeson* to support his claim that he was entitled to appointment of counsel because forcing his existing counsel to make the arguments would be akin to expecting an attorney to litigate his or her own ineffectiveness. Courts do not require counsel to "make such . . . argument[s], which threaten[] their professional reputation and livelihood." *Id*. at 378. However, that case involved the substitution of counsel, as opposed to the appointment of *independent* counsel to make the substitution *argument*. Nothing in our precedent holds that defendants have a right to additional counsel—while represented—to separately argue for substitution of counsel. Thus, we conclude that the district court did not abuse its discretion by declining to appoint Jones additional counsel to litigate his motion to substitute counsel. To the extent Jones seeks review of the district court's refusal to appoint counsel to advocate for him to proceed pro se, the district court did not abuse its discretion for the same reason.

III.

Moving now to the district court's denial of Jones's § 2254 petition, our review is constrained by the heightened standards imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because his claims were adjudicated on the merits in state court proceedings. 28 U.S.C. § 2254(d). Under AEDPA, it is petitioner's burden to demonstrate that the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States." § 2254(d)(1). That, in turn, means that "the applicable substantive law is limited to federal law 'clearly established' by the holdings of Supreme Court decisions." *Jackson v. Smith*, 745 F.3d 206, 210 (6th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A.

Jones first takes issue with a juror unanimity instruction that was given in his case, arguing that the state trial court erroneously instructed the jury that it was required to unanimously find that the mitigating factors outweighed the aggravating circumstances before considering a life sentence, contrary to *Mills v. Maryland*, 486 U.S. 367 (1988). In *Mills*, the Supreme Court invalidated a death sentence where the jury was instructed such that reasonable jurors "may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384.

The instructions used by the state trial court do not suffer from the same defect recognized in *Mills*. The instructions here read in relevant part:

> *It is not necessary that you, the jury, unanimously agree on the existence of a mitigating factor before that factor can be weighed against the aggravating circumstances.*
>
> The procedure which you must follow in arriving at your verdict in this phase of the trial as prescribed by statute and in this regard, you the trial jury, shall consider all of the testimony and evidence relevant to the aggravating circumstances and mitigating factors raised at both phases of the trial, and the final arguments of counsel. You shall then determine whether the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances Odraye G. Jones was found guilty of committing are sufficient to outweigh the mitigating factors present in this case beyond a reasonable doubt.
>
> * * *
>
> If after a consideration of the relevant evidence raised at trial which is relevant to the two aggravating circumstances Odraye G. Jones was found guilty of committing, the mitigating factors and any other factors in mitigation of the imposition of the sentence of death and the arguments of counsel that are relevant to the penalty that should be imposed upon Odraye G. Jones, all twelve members of this jury find that the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances the defendant was guilty of committing are sufficient

to outweigh the mitigating factors in this case, then it will be your duty to find that the sentence of death shall be imposed upon Odraye G. Jones.

If you make such a determination, you should do so as if your decision is absolute and will be carried out. If, however, after consideration of the evidence raised at trial that is relevant to the two aggravating circumstances Odraye G. Jones was found guilty of committing, the statutory mitigating factors and any other factors in mitigation of the imposition of the sentence of death and the arguments of counsel that are relevant to the penalty that should be imposed upon Odraye G. Jones, you find that the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstances he was guilty of committing are sufficient to outweigh the mitigating factors presented in this case, then it will be your duty to determine which of the life sentence alternatives should be imposed: a sentence of life imprisonment without parole eligibility until 25 full years of imprisonment have been served, the sentence of life imprisonment without parole eligibility until 30 full years of imprisonment have been served, or life imprisonment without the possibility of parole.

* * *

*You are not required to unanimously find that the State failed to prove that the aggravating circumstances outweigh the mitigating factors before considering one of the life sentence options. In other words, you should proceed to consider and choose one of the life sentence options if any one or more of you conclude the State has failed to prove that the aggravating circumstances outweigh the mitigating factors.*

(Emphases added.) On direct appeal, the Supreme Court of Ohio recognized that "a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." *Jones*, 744 N.E.2d at 1180 (quoting *State v. Brooks*, 661 N.E.2d 1030, 1042 (Ohio 1996)). It further explained that "no specific language" is required to convey this point, and that the trial court's instructions adequately conveyed the need for a unanimous verdict before imposing the death penalty. *Id.*

In *Smith v. Spisak*, 558 U.S. 139, 148–49 (2010), the Supreme Court rejected a nearly identical claim brought by an Ohio habeas petitioner challenging jury instructions that "mirror[]" those at issue here. *See* Pet'r's Opening Br. at 32 n.10. The *Spisak* Court observed that the jury instructions and jury forms at issue differed significantly from those in *Mills* because they "made clear that, to recommend a death sentence, the jury had to find, unanimously and beyond a reasonable doubt, that each of the aggravating factors outweighed any mitigation circumstances"

and they "did not say that the jury must determine the existence of each individual mitigating factor unanimously." *Spisak*, 558 U.S. at 148. And because the jury instructions did not present "the circumstance that *Mills* found critical," the Court "conclude[d] that [the Ohio Supreme Court]'s decision upholding these forms and instructions was not 'contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' in *Mills*." *Id.* (quoting § 2254(d)(1)) (alteration in original)). Jones's claim that the Ohio Supreme Court's decision was contrary to *Mills* must fail for the same reason given by the Court in *Spisak*. Moreover, Jones's argument that the verdict form contradicted Ohio Supreme Court precedent regarding juror unanimity as to the balancing of the aggravating and mitigating factors is unavailing because *Spisak* makes clear that there is no clearly established federal law on the matter. *Id.* at 149 ("Whatever the legal merits of the rule or the underlying verdict forms in this case were we to consider them on direct appeal, the jury instructions at Spisak's trial were not contrary to 'clearly established Federal law.'" (quoting § 2254(d)(1))).

Finally, we will not consider Jones's additional jury-instruction claims because they were not certified for appellate review. *See Abdur'Rahman v. Colson*, 649 F.3d 468, 473 (6th Cir. 2011) (explaining that a COA is a jurisdictional prerequisite to review and declining to address claims that, while related to the claims authorized by the COA, were analytically distinct).

### B.

We next take up Jones's claim that his right of counsel of his choosing was violated by the trial court's denial of his motions to substitute counsel and for a continuance—after the jury had been empaneled—to allow his newly-retained counsel to prepare for trial.[7] Jones presented this claim to the Ohio Supreme Court, which summarized the underlying facts as follows:

---

[7]We note that the district court granted a separate COA to Jones concerning whether trial counsel were ineffective because animosity existed between him and his counsel. *Jones*, 489 F. Supp. 2d at 851. Jones argues that trial counsel were ineffective for failing to request an ex parte hearing to address the breakdown of his relationship with counsel. But Jones concedes that this argument "was not presented to the courts of Ohio" and "was first presented in the Amendment/Supplement." Therefore, the district court should have held this claim to be procedurally defaulted, and it improvidently granted a COA.

On May 14, 1998, approximately two hours after the jury was sworn, attorney David Per Due filed an entry of appearance with the trial court. The following morning, a hearing was held. Present at this hearing were appellant's court-appointed counsel, the prosecution, and Per Due. Appellant indicated to the trial court that he wanted Per Due to represent him. Appellant stated that he had a "conflict of interest" with the court-appointed attorneys who had been representing him to that point. Specifically, appellant felt that his court-appointed attorneys were "mostly concerned with saving [his] life." He further stated that "if [they] can't win the case for me, then [they] can't do nothing for me." Appellant's court-appointed attorneys explained to the trial court that their relationship with the appellant had been "pretty good" and that there existed an open line of communication between themselves and appellant. They acknowledged appellant's concern that they were not concentrating upon acquittal. They further noted that appellant was concerned that the relationship between themselves and the prosecution had, to that point, been too cordial. Appellant concurred with this assessment.

The trial court offered to let Per Due assist appellant's court-appointed counsel. However, the trial court would not allow Per Due to act as lead counsel because he had not been death-penalty certified by this court. When the court asked Per Due if he would be ready to commence with trial the following Monday, he responded, "Absolutely not." Instead, Per Due requested a four-month continuance. He further indicated that he would be unwilling to assist appellant's court-appointed attorneys as third counsel.

The court denied Per Due's motions for entry and a continuance, concluding that the relationship between appellant and his court-appointed attorneys did not warrant a change in counsel. The court further concluded that the request for continuance was made in bad faith and for purposes of delay. The trial court noted that there had never been, up to that point, any indication that there was a lack of cooperation or trust between appellant and his attorneys.

*Jones*, 744 N.E.2d at 1173–74.

Quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988), the Supreme Court of Ohio observed that, "[w]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate . . . rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." 744 N.E.2d at 1174. Accordingly, the court balanced Jones's right to counsel against the public interest in the prompt and efficient administration of justice by considering "the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that

it resulted in a total lack of communication preventing an adequate defense." *Id.* (quoting *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996)). After review of the trial court's "extensive inquiry" into Jones's relationship with his trial counsel, the Ohio Supreme Court ultimately concluded that the trial court had correctly "balanc[ed] the accused's right to the representation of his chosen counsel against the interests of the public in the prompt and efficient administration of justice," and found that "the public's interests outweighed those of the appellant." *Id.* at 1175. Thus, it found "no abuse of discretion in the trial court's refusal to substitute Per Due for court-appointed counsel." *Id.*

On habeas review, the district court concluded that the Ohio Supreme Court did not unreasonably apply Supreme Court precedent. *Jones*, 489 F. Supp. 2d at 823. Now on appeal, Jones rehashes his argument that the Ohio court's resolution of this issue was an unreasonable application of clearly established federal law because, in his view, *Wheat* applies only to situations where "a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy." Instead, he relies on the Supreme Court's general statement in *Powell v. Alabama*, that "a defendant should be afforded a fair opportunity to secure counsel of his own choice." 287 U.S. 45, 53 (1932).

We do not agree with Jones that the Ohio Supreme Court unreasonably applied federal law. The central teaching of *Wheat* is that a criminal defendant's right to counsel of his choosing is not unlimited. *See* 486 U.S. at 158–59. The Court explained that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* at 159. Thus, the Ohio Supreme Court accurately stated the law—including that Jones had a "*presumptive* right to employ his own chosen counsel"[8]—balanced the requisite factors, and determined that "the trial court correctly found that the public's interests

---

[8]Jones argues that he is entitled to habeas relief because "[n]either the trial court nor the Ohio Supreme Court applied a presumption in favor of counsel of choice." That is incorrect. *See Jones*, 744 N.E.2d at 1174 (acknowledging petitioner's "presumptive right to employ his own chosen counsel") (emphasis and citation omitted).

outweighed those of the appellant." *Jones*, 744 N.E.2d at 1174–75 (quotation omitted).  Given "a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar," *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) (internal citations omitted), we conclude that the Ohio Supreme Court's decision was not an unreasonable application of federal law and deny habeas relief on this claim.

C.

Next, Jones argued in his § 2254 petition that he received ineffective assistance of counsel during the penalty phase of his trial.  He asserts that his trial counsel rendered ineffective assistance both by failing to effectively investigate his background and then by failing to highlight certain mitigation evidence at trial.  Because these claims are intertwined, we address them together.

On direct appeal, Jones argued that his counsel were ineffective for submitting medical records relating to his mother, Darlene, without further explanation.  The Ohio Supreme Court rejected this claim:

> The record indicates that appellant's defense counsel had presented an abundance of evidence regarding appellant's mother, including her inability to form an attachment with appellant and the effect her suicide had upon him.  The subtle tactical choices that appellant now challenges were decisions that lay within the realm of professionally reasonable judgment.  We further find that defense counsel's failure to highlight to the jury specific items of mitigation contained in exhibits submitted to it could not have affected the outcome of the trial, especially in light of the weight and gravity of the aggravating circumstances.

*Jones*, 744 N.E.2d at 1184.

Then, in state postconviction proceedings, Jones argued that his trial counsel were ineffective for failing to investigate additional medical records involving a head injury Jones had suffered and additional information about Darlene.  He also argued that his counsel were ineffective for failing to introduce testimony of his father and paternal grandmother.  The trial court rejected Jones's ineffective assistance claims arising out of these issues because it determined that the evidence would have been cumulative:

> [A]ll of the subject matters of [the testimony of potential witnesses not called by appellant's counsel], to-wit:  the absent parenting of the biological father, the noninvolvement in [appellant's] life by his paternal grandmother, his drug use, gang membership, and emotional upset after the death of his mother, . . . Darlene Jones' drug use, criminal involvement, and abnormal home life, the cultural violence in which [appellant] was raised as well as the death of close friends and relatives and its effect upon his psychological and emotional development, the effect of the physical assault by Maceo Hull and how [it] caused [appellant] to be distrustful of others, and the general violence to which he was exposed were all covered and testified to by those witnesses that were called as mitigation witnesses.

*Jones*, 2002 WL 737074, at *3 (alterations in original).  The Ohio Court of Appeals agreed that any additional evidence on these subjects would have been cumulative.  *Id.*  That court also explained that "[t]here was substantial testimony as to the nature and extent of [Jones]'s injuries during the penalty phase," so any additional medical records establishing Jones's treatment for his head injuries would not have changed the outcome of the penalty phase of trial.  *Id.* at *3–4.

Jones now says that those determinations were unreasonable applications of federal law.  His argument relies largely on *Wiggins v. Smith*, 539 U.S. 510 (2003), where the Supreme Court clarified how the ineffective assistance of counsel standard set forth in *Strickland v. Washington*, 466 U.S. 668, 688–89 (1984), applies in mitigation proceedings.  We find *Wiggins* distinguishable.

There, the petitioner's trial counsel relied solely on a presentence report and social service records, which revealed that Wiggins' "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Wiggins*, 539 U.S. at 524–25.  Counsel conducted no additional investigation into the petitioner's upbringing.  *Id*. at 524.  On postconviction review, Wiggins' counsel investigated and learned the following, which included repeated incidences of sexual abuse:

> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  She had sex with men

while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner—an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, and, as petitioner explained to [the social worker investigating Wiggins' social history], the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id.* at 516–17 (citations omitted). The Supreme Court held that Wiggins received ineffective assistance from his trial counsel for counsel's failure to conduct a reasonable investigation. *Id.* at 534–35. In doing so, the court explained that when "assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. And therefore, because the records available to Wiggins' trial counsel would have compelled a reasonable attorney to investigate further, the Court concluded that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527–28. Accordingly, the Court held that petitioner's clearly established right to effective assistance of counsel under *Strickland* was violated and that the Maryland Court of Appeals' application of *Strickland* was objectively unreasonable. *Id.* at 528.

Jones, on the other hand, was able to elicit testimony from numerous witnesses close to him (as well as from court-appointed experts) to convey to the jury aspects of his social history including neglect, abandonment, violence, a lack of a stable home and family, the impact of his mother's suicide, and the mental health struggles affecting both Darlene and him.

We see no unreasonable application of clearly established federal law in the state courts' conclusions. Though Jones may have found that trial "counsel's presentation of Darlene's suicide was far from compelling," that does not demonstrate that trial counsel were not aware—as in *Wiggins*—of her passing or that trial counsel did not adequately investigate or present mitigating evidence. The Ohio Court of Appeals thus concluded that any additional mitigation

evidence from other witnesses or documentary records would have been cumulative, so his counsel were not ineffective. That conclusion was reasonable. *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam) (reversing grant of habeas relief because "it was not unreasonable for . . . counsel not to identify and interview" additional witnesses beyond those who testified at trial); *Lang v. Bobby*, 889 F.3d 803, 815 (6th Cir. 2018) (affirming denial of habeas relief based upon alleged failure of counsel to investigate petitioner's background and failure to effectively present mitigation evidence).

So too was the Ohio Court of Appeals' conclusion that Jones had not been prejudiced by his counsels' failure to present such testimony. Ultimately, the jury received a trove of information regarding Jones's upbringing, including the trauma and neglect he suffered, as well as information about Darlene's troubled life and eventual suicide, and Jones has not shown a reasonable probability that the outcome would have been different if the additional evidence of this "multi-generational dysfunction" had been introduced by his trial counsel. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Jackson v. Bradshaw*, 681 F.3d 753, 769–70 (6th Cir. 2012) (affirming denial of habeas relief on ineffective-assistance claim for failure to investigate and present mitigating evidence where court could not conclude "that a larger pool of information of the same type already offered was reasonably likely to have altered the jury's balancing decision"); *see also Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."); *cf. Carter v. Bell*, 218 F.3d 581, 596–97 (6th Cir. 2000) (vacating death sentence for ineffective assistance of counsel because trial counsel conducted no independent investigation into defendant's background and instead relied solely on information volunteered by defendant).

IV.

A.

Having concluded that none of the claims presented for review from Jones's § 2254 petition warrant relief, we turn next to issues raised by his appeal from the district court's denial of his Amendment and Supplement. In this filing, Jones argued that he should be allowed to

present additional claims because recent Supreme Court decisions of the time, *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), provided an avenue, in limited circumstances, to excuse procedural default of claims lost through ineffective assistance of postconviction counsel. The district court construed Jones's motion under Rule 60(b) and concluded that none of the claims presented in the Amendment and Supplement fit within the narrow confines for which *Martinez* and *Trevino* allowed the court to set aside procedural default.

Now on appeal, the Warden contends that Jones's pleading was a second-or-successive habeas petition in disguise under the rule set forth in *Moreland v. Robinson*, 813 F.3d 315 (6th Cir. 2016), meaning that Jones was required to obtain precertification from this court before presenting his claims to the district court for review. She therefore argues that the district court lacked jurisdiction over Jones's pleading. *See* § 2244(b)(3)(A). In *Moreland*, we reconciled two prior decisions, *Clark v. United States*, 764 F.3d 653 (6th Cir. 2014), and *Post v. Bradshaw*, 422 F.3d 419 (6th Cir. 2005), addressing whether a post-judgment motion to amend or supplement should be treated as a second or successive petition. "*Clark* held that a post-judgment petition was not second or successive in a case where the petition was filed before the expiration of the time to appeal the district court's denial of the first petition, while our earlier decision in *Post v. Bradshaw* held that a habeas petition *was* a second or successive petition where the petition was filed during the pendency of the appeal from denial of the first petition." *Moreland*, 813 F.3d at 324 (internal citation omitted). The *Moreland* court reconciled these decisions by concluding that "a Rule 60(b) motion or a motion to amend that seeks to raise habeas claims is a second or successive habeas petition when that motion is filed after the petitioner has appealed the district court's denial of his original habeas petition or after the time for the petitioner to do so has expired." *Id.* Put differently, "if the district court has not lost jurisdiction of the original habeas petition to the court of appeals, and there is still time to appeal, a post-judgment motion is not a second or successive habeas petition." *Id.*

The petitioner in *Moreland* filed his Rule 60 motion after the time to appeal had passed, so we held that his Rule 60 motion was a second or successive habeas petition and turned to whether the proposed claims presented in his Rule 60 motion could pass the gatekeeping

requirements of 28 U.S.C. § 2244. *Id.* at 324–25. Section 2244(b)(2) provides that claims not presented in a prior habeas petition shall be dismissed from a second or successive petition unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The *Moreland* court concluded that the petitioner could not meet these requirements even though he—like Jones—relied on *Martinez/Trevino*. *Id.* at 325–26. We first held that the rule established by *Martinez* and expanded by *Trevino* "was equitable, not constitutional," and thus could not be used to satisfy § 2244(b)(2)(A)'s gatekeeping requirement. *Id.* at 326. And second, we concluded that Moreland's claims did not rely on evidence that was unavailable at the time of his original habeas petition. *Id.* Accordingly, the court held that the claims presented in the Rule 60 motion could not be presented in a second or successive habeas petition. *Id.*

We agree with the Warden that *Moreland* controls here—with one caveat. All but one of Jones's proposed claims were newly-raised and properly considered second-or-successive (and thus subject to § 2244 and its gatekeeping requirements). Specifically, Jones argued for the first time in the Amendment and Supplement that: (1) his trial counsel were ineffective for their handling of Theresa Taylor's testimony (with multiple subclaims); (2) that they were ineffective for failing to call a man named Ricky Turner to testify that an alternative suspect, Barksdale, had allegedly confessed to killing Officer Glover; and (3) that his right to a public trial was violated when courthouse deputies did not allow three of his friends to attend the trial. Because these claims were raised for the first time after judgment had entered, and they do not attack a procedural defect in the original denial of Jones's habeas petition, they should have been construed as a second or successive habeas petition that the district court lacked jurisdiction to consider in the first instance. *See id.*; *see also Post*, 422 F.3d at 424–25. In other words, while

we may have authorized an expansion of the remand to consider Jones's procedurally defaulted claims, *Moreland* confirms that doing so was error.**[9]** For these claims, the proper procedure was for Jones to file a second or successive habeas petition and establish that his new claims fit within those gatekeeping requirements.

However, Jones's Amendment and Supplement also raised an ineffective assistance claim arising from his trial counsel's failure to support his motion for a change of venue with empirical evidence that would have demonstrated that the jury venire did not represent a fair cross-section of the community. This claim cannot be characterized as second-or-successive because it was presented in Jones's original pleadings—specifically, in his "Final Traverse," which Jones filed with leave of court. The district court did not resolve this claim in its opinion and order denying Jones's petition for a writ of habeas corpus, and it is not presented for review as part of Jones's appeal from that order.

Accordingly, we will first consider whether any of Jones's second-or-successive claims can proceed through § 2244's gatekeeping requirements before returning to resolve this analytically distinct claim under *Martinez*/*Trevino* and Rule 60(b).

B.

As noted above, Jones has not requested precertification to file a second or successive habeas petition. But even if he had, we conclude that his claims do not meet the gatekeeping requirements of § 2244 because they do not rely on a new rule of constitutional law made retroactive to cases on collateral review or upon newly discovered evidence that establishes his actual innocence. *See* § 2244(b)(2).

As a general matter, we have already decided that neither *Martinez* nor *Trevino* satisfy § 2244(b)(2)(a) as a new rule of constitutional law because those cases establish only an equitable exception to our general rule of procedural default. *Moreland*, 813 F.3d at 326. Nor do Jones's claims rely on any factual predicate that could not have been discovered previously

---

**[9]**To the extent one could argue that we authorized Jones to file a second or successive habeas petition by granting his motion to expand the limited remand, we do not agree. Our order did not reference § 2244 or analyze whether the proposed claims could pass § 2244(b)(2)'s narrow gatekeeping requirements.

that would be sufficient to establish that no reasonable factfinder would have found him guilty of killing Officer Glover.  § 2244(b)(2)(B)(i)–(ii).

The first issue raised in petitioner's Amendment and Supplement relates to his trial counsels' cross-examination of eyewitness Theresa Taylor.[10]  This claim was clearly available at the time Jones filed his original habeas petition, so it is not cognizable in a second-or-successive petition.  *See* § 2244(b)(2)(B)(i).  His next claim arose from his counsels' failure to call a man named Ricky Turner as a witness.  In an affidavit executed in 2015, Turner stated that on the day Office Glover was shot, he heard a rumor that Anthony Barksdale was the shooter.  He further claimed that he was in a bar with Barksdale at some point after the shooting but before Jones's trial, where Barksdale allegedly admitted to shooting Officer Glover and denied that Jones had been the shooter.  Turner further claimed that he was never interviewed by police or Jones's counsel, and that he would have relayed his conversation with Barksdale if he had been asked.  But Jones has not established that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" or that Turner's testimony would have turned the tides such that no reasonable factfinder would have found Jones guilty of murder—particularly in light of the overwhelming evidence of Jones's guilt.[11]  *See* § 2244(b)(2)(B)(i)–(ii).  Finally, regarding Jones's claim that he was denied his right to a public trial, he asserts that his postconviction counsel was deficient for not raising this issue on collateral review, meaning that it was necessarily available at the time Jones filed his § 2254 petition and was based on previously discovered evidence.  *See* § 2244(b)(2)(B)(i)–(ii).

In sum, these additional claims not presented in Jones's § 2254 petition do not fit within § 2244's gatekeeping requirements for second-or-successive habeas petitions, so he cannot obtain review of them.

---

[10]There are actually two claims arising out of counsels' handling of Taylor's testimony.  First, petitioner argues that it was unreasonable to impeach Taylor for her inconsistent statements, rather than attempting to bolster her first-in-time statement implicating another person in the murder.  Second, he claims that his counsel rendered ineffective assistance by failing to call an expert witness to vouch for the credibility of Taylor's first statement. Because these claims rise and fall together for purposes of § 2244, we address them together.

[11]Jones's cousin testified that Jones told him that he intended to shoot a police officer if confronted for the earlier robbery, two eyewitnesses identified Jones as the shooter, and law enforcement observed Jones discarding the pistol used in the shooting moments before he was apprehended.

C.

As discussed above, Jones presented a claim in his final traverse that his trial counsel were ineffective for failing to "offer any evidence" to support the argument that the jury venire was not a fair cross-section of the community. The district court did not address this claim in its opinion and order denying Jones's § 2254 petition and did not grant a certificate of appealability on the issue.[12] But Jones did not seek reconsideration of the court's decision, nor did he move to expand the certificate of appealability to seek review of the omitted claim. And when Jones did raise the claim again—eight years after the district court denied his § 2254 petition—he argued that the claim had been handled so poorly by his postconviction counsel that even though it was raised, it had been procedurally defaulted.

The district court rejected petitioner's argument that the claim had been procedurally defaulted. And without any procedural default to excuse, it ruled that *Martinez*/*Trevino* did not apply. We agree. Jones preserved this claim by arguing in state postconviction proceedings that his counsel were ineffective for failing to present "available, compelling evidence in support of their Motion for Change of Venue" based upon Jones's claim that a change of venue was required because the jury venire was not made up of a fair cross-section of the community. The Supreme Court has made clear that ineffective assistance in the initial-review collateral proceeding excuses procedural default when "the claim should have been raised," but was not. *See Martinez,* 566 U.S. at 14. Here, the claim *was* raised in postconviction proceedings—albeit not supported by the right evidence in petitioner's view—so there was no procedural default to excuse. Because Jones's claim was not procedurally defaulted, that necessarily means that *Martinez* and *Trevino* do not apply, and accordingly, the district court did not err.

However, even if the district court erred by rejecting the claim on this basis, we would affirm on the alternative ground that Jones has not satisfied exceptional circumstances as

---

[12]However, the district court did address Jones's claim that the Ohio Supreme Court unreasonably applied *Duren v. Missouri*, 439 U.S. 357 (1979), on direct appeal, concluding that "[t]he Ohio Supreme Court correctly identified the *Duren* test as the appropriate United States Supreme Court precedent to apply in this instance" and that "it reasonably applied that test to the facts presented in Jones's case." *Jones*, 489 F. Supp. 2d at 819 (citing *Jones*, 744 N.E.2d at 1172–73).

required by Rule 60(b)(6).**13** "Relief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b), which applies only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule." *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 468 (6th Cir. 2007) (alteration, quotation marks, and citations omitted). Relief under that subsection is limited to "unusual and extreme situations where principles of equity *mandate* relief." *Id.* (citation omitted). "[T]he decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Thompson v. Bell*, 580 F.3d 423, 442 (6th Cir. 2009) (citation omitted).

We conclude that Jones has not established extraordinary and compelling circumstances. A change in decisional law like *Martinez/Trevino* "is usually not, by itself, an 'extraordinary circumstance' meriting Rule 60(b)(6) relief," *Stokes v. Williams*, 475 F.3d 732, 735 (6th Cir. 2007) (citation omitted), and that is certainly true when the change in law applies only weakly (at best) to the case at bar, *see McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013) ("[E]ven if *Trevino* changed the law in some Ohio cases and even if a pure change in law could warrant Rule 60(b)(6) relief in truly extraordinary cases, there is nothing extraordinary about this case because the underlying reasons for the *Trevino* gloss on *Martinez* at best apply weakly in this case.").

Moreover, Jones's underlying claim for ineffective assistance based on his trial counsels' failure to gather evidence that might prove a fair-cross-section *Duren* claim in support of his change-of-venue motion is meritless. First, Jones fails to establish that his counsels' change-of-venue strategy was objectively unreasonable under prevailing professional norms. *Strickland*,

---

**13**To the extent that Jones argues that his Amendment and Supplement should be analyzed under Federal Rule of Civil Procedure 15, we disagree. The district court's denial of Jones's initial habeas petition constitutes an adverse judgment, and a motion to amend "after an adverse judgment" requires the movant to "shoulder a heavier burden" because of the "interest of protecting the finality of judgments and the expeditious termination of litigation[.]" *Clark*, 764 F.3d at 661 (quoting *Leisure Caviar, LLC v. United States Fish & Wildlife Serv.*, 616 F.3d 612, 615–16 (6th Cir. 2010)). And even if petitioner thinks *Moreland*'s harmonization of *Post* and *Clark* is "unconvincing" and "ripe for consideration en banc," it remains binding on us. *See Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019).

466 U.S. at 688–89.  The record shows that trial counsel moved for a change of venue based on pre-trial publicity and, immediately after the jury was empaneled, for the additional reason that the racial make-up of the venire was not representative of the community.  Jones's counsel did not offer a fully articulated *Duren* claim in support of this motion, but any such argument would have faced the impediment of Ohio law deeming presumptively constitutional the use of voter registration lists to generate venires.  *See State v. Moore*, 689 N.E.2d 1, 9 (Ohio 1998).  And Jones admits to the difficulty of trial counsel bringing a stand-alone *Duren* claim, noting that the "necessary extra-record evidence means that the claim . . . only could have been adequately raised during post-conviction proceedings."  Jones presents no authority, nor can we find any, to support his claim that his counsels' failure to request pre-trial discovery in support a change-of-venue motion was objectively unreasonable.  Second, even if counsels' performance were deficient, Jones does not attempt to demonstrate actual prejudice.  Based on the overwhelming evidence against Jones, *see supra* n.11, it is far from clear that there is "a reasonable probability that a different . . . jury would have reached a different result."  *Ambrose v. Booker*, 801 F.3d 567, 578 (6th Cir. 2015).  Consequently, Jones's ineffectiveness claim fails to present unusual or extreme circumstances that might warrant equitable relief under Rule 60(b)(6).

For these reasons, the district court did not abuse its discretion by ruling that Jones's ineffective assistance, fair-cross section claim did not satisfy extraordinary circumstances under Rule 60(b)(6).[14]

We affirm the district court's denial of Jones's Amendment and Supplement in full.

V.

Finally, we take up the issue presented in the most recent COA: whether trial counsel were ineffective for failing to prepare expert witnesses during the penalty phase.

---

[14]The district court also denied Jones's motion for discovery because it was based upon the unsuccessful claims presented in Jones's amendment and supplement.  Because we agree with the district court as to the merits, we conclude that it was not an abuse of discretion to deny Jones's motion for discovery.

A.

The Warden contends that this claim is procedurally defaulted, so we cannot review it. Whether a claim is procedurally defaulted is a question we review de novo. *Hodges v. Colson*, 727 F.3d 517, 529 (6th Cir. 2013). Generally, we may not review federal claims that were procedurally defaulted in state courts. *Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020). "We have the option, however, to excuse a procedural default and review a defaulted claim on the merits if a petitioner demonstrates '(1) cause for the default and actual prejudice, or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice.'" *Id.* (quoting *Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004)).

Jones makes three arguments as to the procedural default of this claim: (1) he fairly presented the independent claim that appellate counsel was ineffective, constituting cause; (2) *Martinez* and *Trevino* allow us to reach the merits; and (3) the district court erred in adopting the state court's procedural bar, so the claim is not procedurally defaulted. We disagree with the first two but find merit in his final argument.

First, Jones argues that he has demonstrated cause and prejudice to excuse any procedural default because he received ineffective assistance of appellate counsel on his direct appeal. But, as Jones conceded during oral argument, he never presented an ineffective-assistance-of-appellate-counsel claim to the district court. Thus, he cannot rely on such a claim to excuse the procedural default of his ineffective-assistance-of-trial-counsel claim. *See Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000) ("Although Seymour raised these claims in her state postconviction proceeding, she did not raise them before the district court in the present habeas petition, and no certificate of appealability was issued with respect to them. Therefore, we may not consider them.").

Second, Jones argues that *Martinez* and *Trevino* excuse any procedural default. But, as noted above, the *Martinez/Trevino* exception provides a limited avenue for courts to set aside procedural default caused by ineffective *postconviction* counsel, not procedural default caused by ineffective assistance of counsel on *direct appeal*. Thus, the *Martinez/Trevino* gateway is not open for Jones.

Finally, Jones argues that his claim is not procedurally defaulted at all because the Ohio Court of Appeals erred when it applied its own procedural bar.

Generally, "when a state court decline[s] to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement[,] . . . the state judgment rests on independent and adequate state procedural grounds," and we cannot review those federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). To determine whether a claim has been defaulted by a prisoner's failure to observe a state procedural rule, we "must go through a complicated analysis." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* "Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Id.* "Third, the court must decide whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim," which usually "involve[s] an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims." *Id.* And finally, the petitioner must demonstrate "that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.* (citations and quotation marks omitted).

Jones argues that he satisfied the first *Maupin* condition because he complied with the procedural rule at issue (res judicata) and the Ohio Court of Appeals erred when it applied that rule. Thus, Jones argues, his claim is not procedurally defaulted, and because the claim has never been considered on its merits, he benefits from de novo review. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). We agree.

In Ohio, res judicata "bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from [the judgment of convictions], any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment or conviction, or on an appeal from that judgment." *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982) (emphases and citation omitted). All claims, including ineffective-assistance-of-trial-counsel claims, must be raised on direct

appeal. *Id.* Only claims involving evidence outside the trial record (sometimes referred to as evidence "*dehors*" the record) may be first raised in a petition for state post-conviction relief. *Id.*

But not all evidence will do. The Ohio Court of Appeals has explained that newly presented evidence must "meet some threshold standard of cogency; otherwise, it would be too easy to defeat the [res judicata rule] by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery." *State v. Lawson*, 659 N.E.2d 362, 367 (Ohio Ct. App. 1995) (citation omitted). Thus, "[t]o overcome the *res judicata* bar, evidence offered *dehors* the record must demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original record." *Id.*

As the Warden points out, Ohio's application of its res judicata rule is usually an adequate and independent state ground that triggers a finding of procedural default. *See, e.g.*, *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 829–30 (6th Cir. 2019). But "an incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground." *Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012). Where a state court's "res judicata ruling was factually incorrect[,] . . . it cannot be said that [a petitioner] failed to comply with a state procedural rule that was an 'adequate and independent' state ground under *Maupin*." *Durr v. Mitchell*, 487 F.3d 423, 434–35 (6th Cir. 2007).

Indeed, we do not hesitate to conclude that Ohio courts erred in applying their res judicata rule under appropriate circumstances. *See, e.g., Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) (holding that two new expert affidavits and a testifying expert's post-trial affidavit precluded application of res judicata); *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001) (finding evidence from "witnesses who never appeared at trial" to be "by definition *dehors* the record," rendering the state court's application of res judicata erroneous). Of course, this rule has limits, going beyond which will require a finding of procedural default. For example, a petitioner's "outside evidence . . . of an expert affidavit concerning the standards of representation of a capital case," will not suffice to excuse procedural default, *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010) (internal citation omitted), nor will affidavits from individuals who merely claim they would have testified at trial or provided more

information if asked, *Wogenstahl*, 668 F.3d at 341–42. In short, if we conclude that a petitioner presented evidence outside the trial record that goes to the merits of an ineffective-assistance-of-trial-counsel claim, without which he could not have adequately pursued that claim on direct appeal, res judicata should not bar that claim on post-conviction review. And if, in that instance, the Ohio Court of Appeals erroneously determines that the claim is barred by res judicata, we may consider the merits of that claim de novo.

Applying this to Jones's case is straightforward. On direct appeal, Jones did not raise an ineffective-assistance claim based on trial counsels' choice to present Dr. Eisenberg's testimony. *Jones*, 744 N.E.2d at 1184. Thus, he could not bring such a claim in a post-conviction proceeding unless it was accompanied by appropriate new evidence. In his post-conviction appeal, Jones did raise this ineffective-assistance claim and supported it with an affidavit from psychologist Hugh Turner. Dr. Turner, who had been contacted by postconviction counsel, interviewed Jones and conducted new testing. In Dr. Turner's view, Dr. Eisenberg's diagnosis of APD was incorrect: Jones primarily suffered from post-traumatic stress disorder. However, the Ohio Court of Appeals rejected that evidence and concluded the claim was barred by res judicata. *Jones*, 2002 WL 737074, at *6. Dr. Turner conducted new testing, which is, by definition, evidence outside the trial record. Thus, the Ohio Court of Appeals erred in applying its procedural bar. But before we so hold, we must address two concerns that lurk in the record.

First, the adequate and independent state ground doctrine is rooted in the principles of comity and federalism. If "a federal habeas court releases a prisoner held pursuant to a state court judgment that rests on an independent and adequate state ground, it renders ineffective the state rule just as completely as if this Court had reversed the state judgment on direct review." *Coleman*, 501 U.S. at 730. That would ignore "the State's legitimate reasons for holding the prisoner." *Id.* If we did not apply the adequate and independent state ground doctrine, state prisoners would be afforded "an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws." *Id.* at 731. And when the adequate and independent state ground is a procedural default, as here, "an additional concern comes into play. [The Supreme] Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any

of his federal claims." *Id.* In short, the state "should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Id.*

*Greer* recognized this concern, noting that "[g]enerally, a federal habeas court sitting in review of a state-court judgment should not second guess a state court's decision concerning matters of state law." 264 F.3d at 675. But we went on to conclude that "when the record reveals that the state court's reliance upon its own rule of procedural default [was] misplaced," it is appropriate to second-guess a state court's decision. *Id.* Notably, we did not discuss how much proof of error a petitioner must provide to circumvent the state court's ruling—we just held that we may do so "when the record reveals" that an error occurred. *Id.* Must a petitioner present clear and convincing evidence that the state court erred, a preponderance of evidence that the state court erred, or just raise a doubt that the state court might have erred? It is not clear from *Greer*, and none of *Greer*'s progeny have considered this question. The principles of comity and federalism give us some pause: *Greer* should not be a golden ticket to de novo review in Ohio habeas cases. But, as our predecessors have done, we can leave the question unanswered, because Jones has satisfied any of these burdens. Jones has proven that his state post-conviction petition contained new, not-previously-available evidence, and the Ohio Court of Appeals erroneously rejected that evidence. In this case, given the clear and convincing evidence that the state court erred, we find it appropriate to disturb the state court's ruling on state law.

Second, there is some disconnect between the extra-record evidence and the merits of the claim presented. While we have not examined precisely how closely related the new evidence must be to the merits of the claim presented, we know the outer limit is somewhere around *Hoffner* and *Wogenstahl*, where the "extra-record" evidence consisted of affidavits from lay witnesses bolstering an ineffective-assistance claim rather than affidavits from expert witnesses that bore on the merits of the claim. Here, the extra-record evidence is a new expert affidavit from Dr. Turner, opining that Jones's primary diagnosis was post-traumatic stress disorder rather than APD. But the core of Jones's claim is that trial counsel presented improper racialized

evidence.**15** Dr. Turner's affidavit does not address race at all; it simply challenges the propriety of Dr. Eisenberg's diagnosis. Thus, it is not immediately apparent how Dr. Turner's affidavit can be the "key" that unlocks the de novo "door" to the racialized evidence claim.

However, Dr. Turner *did* criticize Dr. Eisenberg's interpretation of Jones's test results and came to an alternate diagnosis. If Dr. Eisenberg had come to the same diagnosis as Dr. Turner, he would not have had occasion to testify that APD is a disease that affects a large percentage of "urban African American males," whose only chance at success is to be locked up. Put differently, if Dr. Turner's allegedly correct diagnosis was presented to the jury, Dr. Eisenberg's diagnosis (and the racialized testimony accompanying it) would not have been presented, thereby avoiding a potential constitutional violation. Thus, the affidavit is intertwined with the merits of Jones's ineffective-assistance claim and allows for de novo review.

Accordingly, we hold that the Ohio Court of Appeals erred in applying its own res judicata rule, so Jones's claim is not procedurally defaulted.

### B.

Because the claim is not defaulted, AEDPA's deference does not apply, and we review the merits of Jones's claim de novo. *See Maples*, 340 F.3d at 436.

A successful ineffective-assistance claim requires a petitioner to demonstrate that: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The first prong is satisfied when a petitioner "show[s] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The second prong is satisfied when the petitioner "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

---

**15**Jones is *not* bringing a claim that he was incorrectly diagnosed. He does make that argument as part of his mitigation evidence claim, but he does not do so here.

Relying on *Buck v. Davis*, 137 S. Ct. 759 (2017), Jones asserts that trial counsel were ineffective for "produc[ing] an expert who repeatedly told Mr. [Jones]'s jury that Black males are up to thirty times more likely to disregard the safety of others, run a high risk of injury to others, and to be contemptuous of the rights and suffering of others." In *Buck*, a Texas jury convicted Duane Buck of murder. 137 S. Ct. at 767. At that time, imposition of the death penalty required a jury to find "unanimously and beyond a reasonable doubt—a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id*. at 768 (citation and quotation marks omitted). If answered affirmatively, then the jury was asked to determine "whether mitigating circumstances nevertheless warranted a sentence of life imprisonment instead of death." *Id*.

Trial counsel presented the testimony of psychologist Walter Quijano, who discussed the possibility of Buck's future dangerousness using a seven-part test, with one part designated as "race." *Id*. at 768–69. On cross-examination, Dr. Quijano agreed that "the race factor, [B]lack, increases the future dangerousness for various complicated reasons." *Id*. at 769. The jury sentenced Buck to death. *Id*.

The Supreme Court determined that trial counsel performed deficiently because he presented Dr. Quijano's testimony concerning race and violence and admitted his written report, even though "[c]ounsel knew that Dr. Quijano's report reflected the view that Buck's race disproportionately predisposed him to violent conduct; he also knew that the principal point of dispute during the trial's penalty phase was whether Buck was likely to act violently in the future." *Id*. at 775. The Court explained why the introduction of Dr. Quijano's testimony was deficient:

> Given that the jury had to make a finding of future dangerousness before it could impose a death sentence, Dr. Quijano's report said, in effect, that the color of Buck's skin made him more deserving of execution. It would be patently unconstitutional for a State to argue that a defendant is liable to be a future danger because of his race.

*Id*. The Court also explained its finding of prejudice:

> Deciding the key issue of Buck's dangerousness involved an unusual inquiry. The jurors were not asked to determine a historical fact concerning Buck's

conduct, but to render a predictive judgment inevitably entailing a degree of speculation. Buck, all agreed, had committed acts of terrible violence. Would he do so again?

Buck's prior violent acts had occurred outside of prison, and within the context of romantic relationships with women. If the jury did not impose a death sentence, Buck would be sentenced to life in prison, and no such romantic relationship would be likely to arise. A jury could conclude that those changes would minimize the prospect of future dangerousness.

But one thing would never change: the color of Buck's skin. Buck would always be [B]lack. And according to Dr. Quijano, that immutable characteristic carried with it an "[i]ncreased probability" of future violence. Here was hard statistical evidence—from an expert—to guide an otherwise speculative inquiry.

*Id*. at 776 (citation omitted).

Racial evidence similarly infected Jones's case. Trial counsel focused on Dr. Eisenberg's testimony that "few" "urban African American males" diagnosed with APD actually commit murder, and in response, Dr. Eisenberg testified that "one out of four African males of the age 25 are incarcerated in some capacity or on some kind of strict probation. So that would eliminate those individuals from engaging in this conduct. So part of it is incarceration itself that precludes homicide." Dr. Eisenberg told the jury that, absent incarceration or probation, Black men diagnosed with APD would commit more murders. Much like the expert in *Buck*, Eisenberg's "opinion coincided precisely with a particularly noxious strain of racial prejudice"— that of Black men as "violence prone"—which offends the Constitution on its face and cannot be considered strategic. 137 S. Ct. at 776.

*Buck* therefore makes clear that Jones's trial counsel were ineffective for allowing the jury to hear Dr. Eisenberg's racially prejudicial testimony. And because, as part of the sentencing process, the jury passed judgment on whether this racist evidence *itself* was a mitigating factor, there is a reasonable probability that Jones would have received a lesser sentence if Dr. Eisenberg's testimony was not introduced. *See id*. at 776–77. Accordingly, we hold that Jones has satisfied both *Strickland* prongs and is entitled to a new sentencing.

VI.

For these reasons, we affirm in part and reverse in part. We affirm in all respects the judgment of guilt entered on the jury's guilty verdict, but reverse the judgment of the death sentence because of the ineffective assistance of counsel at the penalty phase. We remand the case to the district court with instructions to issue a writ of habeas corpus vacating Jones's death sentence unless the State of Ohio conducts a new penalty-phase proceeding within 180 days of remand.